STROUD, Judge.
 

 *475
 
 Plaintiff appeals order and judgment regarding equitable distribution. We affirm the trial court's classification and valuation of the defendant's interest in a partnership with his father, but reverse the classification of the post-separation distributions from the partnership to defendant and remand for entry of a new order which classifies these post-separation distributions as divisible property and orders a new distribution.
 

 I. Background
 

 Plaintiff Dawn Blair ("Wife") and Defendant Everette Blair ("Husband") were married on 28 February 1994 and separated on 31 August 2011. On 6 October 2011, Wife filed a complaint with claims against Husband for post-separation support, alimony, equitable distribution, and attorney fees.
 
 [1]
 
 On 16 November 2011, Husband filed an answer and counterclaim for equitable distribution. Wife and Husband
 
 *476
 
 both alleged they were entitled to a greater than one-half distribution of marital property based upon statutory factors under North Carolina General Statute § 50-20(c).
 

 Trial of equitable distribution was held on 16 October, 10 December, and 12 December of 2014; and the 24th and 25th of August 2015. The issues on appeal all are related to the classification, valuation, and distribution of Blair Iron and Metal ("the Business"), a partnership between Husband and Joe Blair, his father. The equitable distribution judgment was entered on 4 November 2016, and Wife filed notice of appeal.
 

 II. Petition for Certiorari
 

 Husband filed a petition for certiorari, requesting to assert issues on appeal also arising out of the classification and valuation of the Business. Husband avers that he failed to file notice of his cross-appeal under N.C. R. App. P. 3(c)(3) due to excusable neglect, as his counsel did not realize a notice of appeal was required for the issues he wished to present on appeal, which were listed in the record on appeal as his proposed issues. Husband states in his petition that the issues he wished to present were (1) whether evidence from Ms. Fonvielle regarding date of marriage value of the Business should have been excluded because it was not disclosed in discovery; (2) whether Ms. Fonvielle's valuation of the Business should have been excluded for various reasons; and (3) whether the trial court erred by excluding Husband's proposed expert witness, Mr. Prestwood, regarding
 
 *416
 
 valuation of the Business.
 
 [2]
 
 Husband states in his petition that there are "no attachments to this Petition because everything required for this Court to consider[,]" as to whether to issue Writ appears in the Record.
 

 From our review of the transcript and record, the record does not include everything required for us to consider Husband's proposed issues. All three of these issues are based primarily upon Ms. Fonvielle's valuation and the information upon which she based her evaluation. But Ms. Fonvielle was appointed as the expert to do the business valuation by a consent order which is not in our record. The trial court ruled that Mr. Prestwood could not testify based upon that consent order:
 

 *477
 
 THE COURT: In looking at the consent order of September the 5th, 2012, um, and remembering the discussions that surrounded the appointment of an expert to value Blair Iron & Metal, specifically that consent order does say that the parties requested the Court to appoint an expert, and it was the Court's appointment of the expert upon the request, joint request, of the plaintiff and defendant, um, and so I am going to disallow the testimony of Mr. Prestwood as the Court had the expert appointed to value this business. Mr. Lackey, I understand you weren't involved then, but Mr. Blair as represented by counsel, um, and that's the Court's ruling.
 

 MR. BEACH: Thank you, Your Honor.
 

 Without the consent order appointing Ms. Fonvielle, we would be unable to review this ruling by the trial court. We would also be unable to determine the exact scope and terms of Ms. Fonvielle's valuation set out in that order, so we would be unable to review Husband's other proposed issues. We also note that Husband did not object to the introduction of Ms. Fonvielle's report as evidence at trial and that his arguments attacking her valuation go to weight and credibility of the evidence, not admissibility. We therefore deny Husband's petition for certiorari to address his proposed issues.
 

 III. Equitable Distribution
 

 Wife raises seven issues on appeal and challenges many findings of fact, although some findings of fact Wife challenges are mixed with conclusions of law. To make matters more confusing, Wife's brief addresses only four issues in detail, and for the remaining issues she simply notes that the issue is "the same issue" as addressed in the argument for another issue but "because of the complex and mixed nature of the issues, it is submitted again here to make clear the nature of the challenges." So according to Wife's brief, issues I, II and VI are really "the same issue[;]" III, IV, and V are "the same issue[;]" and VII stands alone. We will attempt to sort out these "complex and mixed" issues in some rational manner but would encourage appellants to organize issues in a more orderly fashion. For example, if three issues are "the same issue," then they should be presented together as one issue. Furthermore, although Wife's brief mentions many findings of fact in the issues and the headings of the arguments contend that some findings are not supported by the evidence, the substance of her brief does not challenge the findings of fact as unsupported by the evidence. Wife's actual issues arise from the trial court's conclusions of law-which at times are
 
 *478
 
 labeled as findings of fact-and thus we address the substance of Wife's arguments which is the trial court's legal conclusions.
 

 A. Standard of Review
 

 Standards of review guide the Court's consideration of all appeals, so they are also useful in determining an orderly manner for presentation of issues. Unfortunately, Wife's brief states several standards of review for each argument, since the issues in each are mixed. If the findings of fact upon which the challenged conclusions of law are not supported by the evidence, the conclusions themselves must fail.
 
 See generally
 

 *417
 

 Peltzer v. Peltzer
 
 ,
 
 222 N.C. App. 784
 
 , 786,
 
 732 S.E.2d 357
 
 , 359 (2012). If the findings are supported by the evidence, then we review de novo the trial court's conclusions of law based on those findings.
 
 See generally id
 
 ;
 
 Westmoreland v. High Point Healthcare Inc.
 
 ,
 
 218 N.C. App. 76
 
 , 79,
 
 721 S.E.2d 712
 
 , 716 (2012). Restated,
 

 [t]he standard of review on appeal from a judgment entered after a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment. The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary. The trial court's findings need only be supported by substantial evidence to be binding on appeal. We have defined substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.
 

 Peltzer
 
 ,
 
 222 N.C. App. at 786
 
 ,
 
 732 S.E.2d at 359
 
 (citations, quotation marks, and brackets omitted). Also,
 

 [t]he labels "findings of fact" and "conclusions of law" employed by the trial court in a written order do not determine the nature of our review. If the trial court labels as a finding of fact what is in substance a conclusion of law, we review that "finding" de novo.
 

 Westmoreland
 
 ,
 
 218 N.C. App. at 79
 
 ,
 
 721 S.E.2d at 716
 
 (citations omitted).
 

 Furthermore, classification of property is a conclusion of law which we review
 
 de novo
 
 :
 

 Because the classification of property in an equitable distribution proceeding requires the application of legal
 
 *479
 
 principles, this determination is most appropriately considered a conclusion of law. The conclusion that property is either marital, separate or non-marital, must be supported by written findings of fact. Appropriate findings of fact include, but are not limited to, (1) the date the property was acquired, (2) who acquired the property, (3) the date of the marriage, (4) the date of separation, and (5) how the property was acquired (i.e., by gift, bequest, or purchase).
 

 Hunt v. Hunt
 
 ,
 
 112 N.C. App. 722
 
 , 729,
 
 436 S.E.2d 856
 
 , 861 (1993) (citations omitted);
 
 see generally
 

 Westmoreland
 
 ,
 
 218 N.C. App. at 79
 
 ,
 
 721 S.E.2d at 716
 
 .
 

 Finally, we review the distribution of the marital property for clear abuse of discretion:
 

 As to the actual distribution ordered by the trial court, when reviewing an equitable distribution order, the standard of review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason.
 

 The trial court's unchallenged findings of fact are presumed to be supported by competent evidence.
 

 Peltzer
 
 ,
 
 222 N.C. App. at 787
 
 ,
 
 732 S.E.2d at 359-60
 
 (citations, quotation marks, and brackets omitted).
 

 Again, because Wife's actual issues are objections to the trial court's conclusions of law, and those conclusions are mixed in with the findings of fact in the order, we assume that Wife listed the findings as part of her issues on appeal because she had difficulty separating the findings from the conclusions. We have had the same problem. We will simply start at the beginning of the order and address Wife's challenges to the conclusions of law as they appear in the order.
 

 B. Partnership Percentages
 

 Evidence relevant to the issues on appeal was presented at the three days of hearing in 2014 and two days in 2015. Almost all of the substantive evidence regarding the Business was presented in 2014. The Business was originally known as Blair Auto and Machine and was a sole proprietorship of Joe Blair. At its inception, the Business did primarily car repair and repair of specialized machinery parts. The trial
 
 *480
 
 court's findings about the formation and existence of the partnership between Husband and his father are not challenged on appeal, although the
 
 *418
 
 percentage interest of Husband is an issue.
 
 [3]
 
 Some findings regarding the formation of the business are uncontested:
 

 12. In December 1993 the Defendant, Plaintiff, Joe Blair and May Blair had several discussions concerning the Defendant quitting his job and going into business with Joe Blair.
 

 13. The parties were quite informal regarding the formation of a partnership. The idea was discussed at two meetings where all four were present. In addition, the Plaintiff and Defendant had some discussions over a One to two month period. Also, the Defendant and his father had several discussions regarding forming a partnership.
 

 ....
 

 15. The Defendant was the primary manager and also the day to day operations manager of the partnership he had formed with his father.
 

 16. The purpose of the partnership was to maintain the business Joe Blair operated and further develop a recyclable material business as a wholesaler.
 

 18.
 
 [4]
 
 The Defendant quit his employment at Burns Wood Products as of February 11, 1994....
 

 19. No paper writing was ever drawn concerning the operation and interests of the partnership. The Defendant did not "buy into" the partnership; he just began working and managing the partnership's business. All capital, machinery, equipment, buildings, vehicles etc. were Mr. Joe Blair's at the formation of the partnership.
 

 20. Defendant's partnership interest was gift to him alone from his father, and it was made before the parties' date of marriage.
 

 *481
 
 21. No partnership documents were filed with the Secretary of State nor any other government entity except for tax records and some records regarding the purchase of equipment. A special account was opened at First Union not in the name of the partnership but titled "Joe and Everette Blair Special Account."
 

 22. Tax records for 1994 indicate the partnership was formed on January 1, 1994.
 

 23. The partnership between Joe Blair, Defendant's father, and Everette Blair, Defendant, was formed on January, 1, 1994.
 

 24. The tax records indicate the partnership's profits and liabilities were allocated at 70% to the Defendant and 30% to Joe Blair. These percentages of profit and liabilities were maintained from 1994 through and including tax year 2000.
 

 25. In tax year 2001, the company name of Blair Auto and Machine was changed to Blair Iron and Metal. The tax records from 2001 through 2013 represent the company name as Blair Iron and Metal.
 

 26. In tax year 2001, the records show the partnership's profits and liabilities changed for Everette Blair from 70% to 60%. The tax records show the change of the partnership's profits and liabilities for Joe Blair changed from 30% to 40%. See Plaintiff's Exhibit #10.
 

 27. From tax year 2002 until tax year 2013, the partners listed for Blair Iron and Metal were Joe Blair and Everette Blair. The percentage of profits and liabilities remained consistent for each tax year as Everette Blair having a 60% and Joe Blair having a 40%. See Plaintiff's Exhibits #17-#28.
 

 Plaintiff challenges these "findings of fact" regarding the partnership percentages:
 

 33. Even though many of the partnership tax returns show that the Defendant received 60% of the profits, the partnership was between the Defendant and his father, Joe Blair, with 50% ownership by the Defendant and a 50% ownership interest by Joe Blair. Mr. Joe
 
 *419
 
 Blair routinely
 
 *482
 
 allowed the Defendant to take more than 50% of the profits because the Defendant had a young family, including a step-daughter by the Plaintiff, to support. The generosity of the Defendant's father and mother for that matter is further demonstrated by the fact that the parties' real estate was a gift to them from the Defendant's parents.
 
 [5]
 

 ....
 

 61. The Court finds the partnership interest of the Defendant on the date of separation was 50%.
 

 Wife also challenges Findings 64 and 65, regarding Husband's 50% partnership interest and the basic math which results from applying a 50% interest to the values determined.
 

 Findings of fact 26 and 27, which are not challenged, also addressed the income tax returns and the partner's percentages of interest on the returns. The tax returns of the partnership were admitted as evidence, and as the finding states, the tax returns showed Husband's partnership interest as sixty percent. Despite repeatedly filing tax returns "under penalty of perjury" which set forth a sixty percent interest for Husband, Husband testified that the business was actually a fifty-fifty partnership:
 

 Q. Mr. Blair, do you-did you and your father have an agreement as to your percentage ownership of the partnership? Were you fifty/fifty, forty/sixty, seventy/thirty? Was there an agreement about that?
 

 A. Yes.
 

 Q. What was the agreement?
 

 A. We were equal partners, fifty/fifty.
 

 Q. Can you explain to us why, as the tax returns will show over the years, you almost always took something more than fifty percent of the distributions of the partnership's profits?
 

 A. Yes. The whole, or main purpose, of our joining as a partnership was to help to provide for me a means of living and income to support a family, which I was beginning and already had children. Uh, in the early years,
 
 *483
 
 especially, there was not enough income, profit, to barely support one person, let alone two. And it was always the intent, uh, of-of us both that that was the primary purpose of the business was to provide a living for me, as well as he, uh, as it would provide. The, uh, the amounts through the years have always swayed in my favor, as far as the draws or pays or whatever you want to call them, uh, because I always took the larger percentage. I had a family to raise and needed more income. Uh, the-as far as the tax returns and those percentages are shown, those were just what the tax people told us we needed to do, because I was taking the majority (inaudible), you know, I don't know if we just kind of followed along with what we were told we should do.
 

 Although the tax returns are substantial evidence of the partnership percentages, they are not dispositive in this context. The evidence is conflicting, but the credibility and weight of the evidence, which includes the tax returns and testimony, are evaluated by the trial court.
 
 See
 

 In re Whisnant
 
 ,
 
 71 N.C. App. 439
 
 , 441,
 
 322 S.E.2d 434
 
 , 435 (1984) ("[W]hen a trial judge sits as both judge and juror, as he or she does in a non-jury proceeding, it is that judge's duty to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom." (citation and quotation marks omitted) ).
 

 In
 
 Davis v. Davis
 
 , this Court addressed the sufficiency of the evidence in an action seeking the dissolution of an alleged partnership.
 
 58 N.C. App. 25
 
 , 26,
 
 293 S.E.2d 268
 
 , 269 (1982). The defendant denied the existence of a partnership based upon there being no written partnership agreement and his contention that the parties "never had a meeting of the minds on a verbal partnership agreement."
 
 Id.
 
 at 27,
 
 293 S.E.2d at 269
 
 (quotation marks omitted). This Court noted the evidence regarding the formation of a partnership,
 
 *420
 
 including the partnership tax returns filed by the parties:
 

 Plaintiff's evidence clearly shows that the parties discussed his coming into the business which led to their subsequent engagement together in business transactions. Plaintiff understood their oral agreement to provide that he would own 30% of the business, but William stated that the terms of their agreement were that initially he would get thirty percent of the net profits of the business after all expenses. In addition, there is evidence that
 
 *484
 
 William considered plaintiff as management because he could not trust an employee. The evidence that plaintiff received a share of the profits of the business therefore is
 
 prima facie
 
 evidence that he is a partner because there is no other evidence that the share of the profits paid to plaintiff was considered employee's wages.
 

 Further, the filing of a partnership tax return is significant evidence of the existence of a partnership. Under the State and Federal income tax laws, a business partnership return may only be filed on behalf of an enterprise entered to carry on a business. There is evidence in the present case that William prepared the tax return for the business indicating himself and plaintiff as co-owners. This constitutes a significant admission by William against his interest in denying the existence of a partnership.
 

 Although William testified that he and plaintiff never agreed on the terms of a partnership, the evidence of the acts and declarations of the parties was sufficient for the jury to infer that a partnership existed in which William and plaintiff were the owners in 70% and 30% shares. Thus, the trial judge did not err in denying defendants' motions for directed verdict and for judgment notwithstanding the verdict.
 

 Id.
 
 at 30-31,
 
 293 S.E.2d at 271-72
 
 (citations, quotation marks, and brackets omitted).
 

 Although
 
 Davis
 
 was a business dispute decided by a jury, it is instructive here because this Court noted the evidence of the income tax returns was "a significant admission by [the defendant] against interest" in denying the formation of a partnership, and arguably, by extension, the returns would also be significant evidence of the partners' percentages of interest.
 
 Id.
 
 at 31,
 
 293 S.E.2d at 272
 
 . But the tax returns were not dispositive, because the jury had the option to accept either the income tax returns as supporting the existence of a partnership or the defendant's testimony there was no partnership, despite the tax returns.
 
 See
 

 id.
 
 at 31-32,
 
 293 S.E.2d at 272
 
 . In
 
 Davis
 
 , the jury ultimately found the tax returns and the plaintiff more credible and decided there was a partnership in which plaintiff was a 30% partner.
 
 See
 

 id.
 
 at 31,
 
 293 S.E.2d at 272
 
 .
 

 Here, the trial court found Husband's testimony that his interest in the partnership was only 50% to be credible and rejected the evidence of the tax returns based upon Husband's testimony that the tax returns
 
 *485
 
 "just kind of followed along with what we were told we should do" by "the tax people[.]" "In an equitable distribution case, the trial court is the fact-finder. Fact-finders have a right to believe all, none, or some of a witness' testimony."
 
 Zurosky v. Shaffer
 
 ,
 
 236 N.C. App. 219
 
 , 240,
 
 763 S.E.2d 755
 
 , 768 (2014) (citations omitted). Wife's argument on the trial court's determination that Husband's partnership interest was 50% is overruled.
 

 C. Valuation of the Business
 

 Wife also challenges several findings of fact regarding the trial court's valuation of the business as of the date of separation. We first summarize the relevant findings which are not challenged on appeal. The trial court found the value of the business as of the date of marriage was $10,000, based upon the estimate of the expert witness on valuation; there was no other evidence of value as of the date on marriage presented, since Husband's valuation was simply "more than" $10,000, and Wife had only "a 'guess[.]' " The trial court noted that the parties entered into a consent order on 5 September 2012 appointing Betsy H. Fonvielle, CPA,
 
 [6]
 
 as an
 
 *421
 
 expert witness to conduct an appraisal of the Business.
 
 [7]
 
 The trial court also noted Ms. Fonvielle's qualifications, accreditation, and experience as an expert witness in business evaluation. Several findings, not challenged on appeal, addressed the valuation process and methodology:
 

 43. Ms. Fonvielle used several factors in her valuation of the partnership on the date of marriage as follows:
 

 a. The tax records indicate the property initially placed in the partnership was one 14" shear listed as depreciable property placed in service as having a value of $1,200. Also listed was a Chevy truck placed in service having a value of $19,000 and used 80% as business purposes. Finally, listed was a 1991 Buick placed in service having a value of $10,000 and used for business purposes 68%. The business depreciative value was $7400 for the 1983 Chevy truck and $6800 for the 1991 Buick.
 

 *486
 
 The partnership listed no other assets. See Plaintiff's Exhibit #7.
 

 b. The taxable income for Blair Auto and Machine for tax year 1994 was $20,434.00. The partnership sales were $46,747.00. Inventory was listed as zero as of January 1, 1994. See Plaintiff's Exhibit #7.
 

 c. A special account was set up at First Union Bank in the name of Joe Blair and Everette Blair and showed a balance of $867.94 as of February, 1994. The statement indicates the previous balance was zero.
 

 d. The business did use some tools which had been accumulated previously by Joe Blair such as turning lathes, drill presses, grinders, hand tools, milling machine, and a cable crane. Some of these machines and tools are still used in the business.
 

 ....
 

 46. Over the first three to six years of the partnership, the company increased its focus toward collecting scrap metal for recycling instead of equipment and car repair. It developed facilities to include a small office building, drive-on scales, grading a large area of its 2.5 acres for storage and sorting metals.
 

 47. The business purchased metal for recycling from the public from 1994 until the parties' separation.
 

 48. The business also placed containers at various plants, including local metal and fabricating businesses, to recycle metal from their scrap. Sometimes the business contracted to purchase the scrap from these plants and sometimes the plants do not charge in an effort to simply get rid of their scrap.
 

 49. The Defendant's business operations from the formation of the partnership until the date of separation were six days per week, having six working employees and the business being opened to the public for sales, all of which was intended to increase business profitability. The Defendant reinvested heavily in equipment as displayed on Exhibit G in Plaintiff's Exhibit #1 referenced hereto and incorporated hereby by reference.
 

 *487
 
 50. The costs of equipment is listed Exhibit G reflects as value of $613,541.00. The Court recognizes this is not an estimate of the fair market value of the equipment on that day; however, it does reflect the heavy reinvestment undertaken by the partners up until date of separation.
 

 51. Upon entering into an engagement agreement with the parties, Ms. Fonvielle gathered financial data from the partnership tax returns including a list of assets requested of documents reflecting liabilities of the partnership, and bank statements of the partnership. She undertook a site visit to the company,
 
 *422
 
 interviewed the Defendant regarding the history of the operations and profitability of the company, and she interviewed the Plaintiff regarding the history of the operations and profitability of the company.
 

 52. Mrs. Fonvielle found some of the financial information incomplete. The balance sheets of the company did not balance. While requested, neither the Defendant nor the Plaintiff provided any documentation of the amount of inventory on the date of separation. However, both parties did provide estimates based upon their recollection during interviews and Court testimony. Mrs. Fonvielle did consider these amounts and compared the amounts to industry wide data in determining her estimate of value.
 

 53. At the request of the Defendant, Ms. Fonvielle again valued the company as of December 31, 2013. At that time she examined further tax records, journals of income and expenses, and bank statements of the company. She interviewed the Plaintiff and the Defendant regarding business operations and profitability since her first evaluation. Ms. Fonvielle did a similar comparison of the economic forecast, industry data, and regional competition as in her first analysis.
 

 54. Ms. Fonvielle used three different accounting valuation methods in determining the value of the partnership for both points in time.
 

 55. She used the Net Asset Approach, the Capitalized Earnings Approach, and the Direct Market Data Approach.
 

 *488
 
 An Asset valuation of the partnership was not performed. See Plaintiff's Exhibit #1.
 

 56. Ms. Fonvielle further discounted the business due to the partnership being a family owned business and its lack of liquidity by 10%.
 

 57. Ms. Fonvielle did not discount or considered how accrued, but unpaid rent to Mr. and Mrs. Joe Blair by the partnership impacted the value of Blair by the partnership impacted the value of Blair Iron and Metal on either the date of separation value or December 13, 2013 valuation date.
 

 But Wife does challenge finding 58:
 

 58. Ms. Fonvielle appraised the value of Blair Iron and Metal on the date of separation as Five Hundred Forty Thousand Dollars ($540,000.00) with Defendant's 50% interest in Blair Iron and Metal as being $270,000.00. Ms. Fonvielle's appraisal was based on consideration of the three approaches to determining value: the net asset approach, the capitalized earnings approach, and the direct market data approach.
 

 Finding 58 first simply recites Ms. Fonvielle's valuation as of the date of separation as $540,000; it is not a finding of fact but only a recitation of evidence. The trial court did not
 
 find
 
 the same value as Ms. Fonvielle but instead found a different value in Finding 60, which Wife did not challenge: "Giving full weight to 2009 earnings and applying the result to the mathematical calculations shown in Ms. Fonvielle's report, the Court finds that the fair market value of Defendant's interest in Blair Iron and Metal as of the date of separation was $232,183.00." The remainder of Finding 58 also notes the valuation methods Ms. Fonvielle used; the evidence shows that she did use these methods, although the trial court explained in unchallenged Finding 59 why it did not agree with Ms. Fonvielle's value in Finding 58:
 

 59. Ms. Fonvielle's appraised values are overstated because in her capitalized earnings approach to value, Ms. Fonvielle completely disregarded Blair Iron and Metal's unusually low earnings in 2009 while giving full weight to its unusually high earnings in 2008. The Court finds that if Blair Iron & Metal's unusually high earnings in 2008 are given full weight, then its unusually low earnings
 
 *489
 
 in 2009 must also be given full weight in determining fair market value.
 

 The trial court went on to make these unchallenged findings:
 

 62. The value of the partnership of Blair Iron and Metal on the date of separation was Four Hundred Sixty-four
 
 *423
 
 Thousand Three Hundred Sixty-seven Dollars ($464,367.00).
 

 63. The value of Defendant's 50% interest in Blair Iron and Metal on the date of separation was Two Hundred Thirty-two Thousand One Hundred Eighty-three Dollars ($232,183.00).
 

 Wife also challenges other findings of fact regarding valuation, but those findings again address the trial court's determination, which we have already addressed, that Husband had a 50% interest in the Business. This argument is overruled.
 

 D. Classification of Appreciation during Marriage
 

 Wife contends the increase in the value of the Business during the marriage was active and thus marital, so the trial court erred in characterizing one-half of the increase in value since the date of marriage as passive appreciation, and thus Husband's separate property. Wife challenges Finding 66: "The increase in value during the marriage of Defendant's 50% interest in Blair Iron and Metal is composed of active appreciation and passive appreciation." Wife next notes several findings of fact but does not argue they are unsupported by the evidence. Instead, Wife challenges the conclusions of law mixed into these "findings" as not supported by the findings or the law; these findings are:
 

 67. The Court finds that not all of the increase in Defendant's interest in Blair Iron and Metal was attributable to active appreciation due to Defendant's efforts. Defendant's father worked in the business along with Defendant. He contributed machinery and equipment to the business. The business operated on property owned by Defendant's parents without having to pay any rent. Defendant's father made some of the equipment used in the business. Furthermore, he used his expertise as a mechanic to repair and maintain the equipment and machinery used in the business, saving the business from having to pay a third party for such repairs and maintenance and/or purchase new machinery and equipment.
 

 *490
 
 The active efforts of a third party, Defendant's father, contributed to the increase in the value of Defendant's interest in Blair Iron and Metal during the marriage.
 

 68. Market conditions also contributed to the increase in the value of Defendant's interest in Blair Iron and Metal during the marriage. In early 1995 Blair Iron and Metal was receiving approximately $3.50 per CW for the scrap metals it sold. In late 2008 and early 2009, it was receiving approximately $6.25 per CW. In 2011, the year of the parties' separation, it was receiving $16.00 and $17.00 per CW for scrap metals. During the marriage the price Blair Iron and Metal received for the scrap metal it sold increased more than 450%. This is purely market-driven appreciation in the price of Blair Iron and Metal's product that has nothing to do with Defendant's efforts.
 

 69. At least one-half (1/2) of the increase in the value of Defendant's interest in Blair Iron and Metal during the marriage was attributable to factors other than active appreciation due to Defendant's efforts.
 

 70. Fifty percent (50%) of the increase in value of Blair Iron and Metal from the date of marriage, February 28, 1994, to the date of separation, August 31, 2011, was due to the active appreciation in the business by the martial efforts of the Plaintiff and Defendant, and Fifty percent (50%) of the increase in value of Blair Iron and Metal from the date of marriage, February 28, 1994, to the date of separation, August 31, 2011, was due to passive appreciation through efforts of Joe Blair and market conditions.
 

 71. The marital interest in Defendant's interest in Blair Iron and Metal as of the date of separation was 1/2 ($227,183.00) = $113,592.00.
 

 Husband initially acquired his interest in the Business from his father as a gift just prior to the marriage, and the trial court
 
 *424
 
 valued the Business at $10,000 at that time.
 
 [8]
 
 During the marriage, Husband worked in the Business and it appreciated in value. Wife contends that Husband failed to rebut the presumption that the increase in the value of the Business
 
 *491
 
 during the marriage was marital property and challenges the trial court's allocation of appreciation during the marriage as half passive because it wrongfully relied upon "the efforts of [Husband's] father" and "market conditions[.]" (Quotation marks omitted).
 

 Wife correctly notes that based upon the findings that the Business increased in value during the marriage, there is a presumption that the appreciation is active and therefore marital, and the burden of proof was on Husband to rebut that presumption and show that the increase was passive:
 

 When marital efforts actively increase the value of separate property, the increase in value is marital property and is subject to distribution. To demonstrate active appreciation of separate property, there must be a showing of the (1) value of asset at time of acquisition, (2) value of asset at date of separation, (3) difference between the two.
 
 Any increase is presumptively marital property unless it is shown to be the result of passive appreciation
 
 .
 

 In light of the remedial nature of the statute and the policies on which it is based, we interpret its provision concerning the classification of the increase in value of separate property as referring only to passive appreciation of separate property, such as that due to inflation, and not to active appreciation resulting from the contributions, monetary or otherwise by one or both of the spouses.
 

 In order for the court to value active appreciation of separate property and distribute the increase as marital property, the party seeking distribution of the property must offer credible evidence showing the amount and nature of the increase.
 

 Conway v. Conway
 
 ,
 
 131 N.C. App. 609
 
 , 615-16,
 
 508 S.E.2d 812
 
 , 817-18 (1998) (emphasis added) (citations and quotation marks omitted).
 

 Wife argues that Husband's father's work in the Business should not be considered as passive appreciation since he is a partner, but appreciation from contributions by a business partner of a spouse can be considered as passive appreciation.
 
 See generally
 

 Lawing v. Lawing,
 

 81 N.C. App. 159
 
 ,
 
 344 S.E.2d 100
 
 (1986). In
 
 Lawing
 
 , the defendant-husband owed 48% of the shares in a corporation, "Lawings, Inc. ('LINC')," while the plaintiff-wife owned 6%, and husband's brother owned the
 
 *492
 
 remaining shares.
 
 81 N.C. App. at 161
 
 ,
 
 344 S.E.2d at 103
 
 . Some of the husband's shares were inherited from his father and were his separate property.
 
 See
 

 id.
 

 at 174
 
 ,
 
 344 S.E.2d at 110
 
 . LINC increased in value substantially during the marriage.
 
 See
 
 id.
 

 The plaintiff-wife argued on appeal the trial court erred by treating all of the appreciation in the husband's separate shares of LINC as his separate property, and this Court agreed:
 

 This Court has recently addressed questions of this type in applying G.S. 50-20(b)(2), under which inherited property is separate property and increases in value of separate property are also separate property. In each case we have held that increases in value remained separate property only to the extent that the increases were passive, as opposed to active appreciation resulting from the contributions of the parties during the marriage.
 
 McLeod v. McLeod, supra
 
 [,
 
 327 S.E.2d 910
 
 (1985) ]
 
 ;
 

 Phillips v. Phillips, supra
 

 ;
 

 Wade v. Wade, supra
 
 [,
 
 325 S.E.2d 260
 
 (1985) ]..... [W]e hold that the
 
 Wade
 

 -
 

 Phillips
 

 -
 

 McLeod
 
 rule applies here.
 

 Id.
 
 at 174-75,
 
 344 S.E.2d at 110
 
 . Here the trial court used the approach in
 
 Lawing
 
 to value the appreciation during the marriage.
 
 See
 
 id.
 

 But Wife contends that the evidence
 
 *425
 
 was not sufficient to support the trial court's determination that half of the appreciation was active and half was passive, so the presumption the increase was marital should apply.
 

 However,
 
 Lawing
 
 specifically approved consideration of the efforts of a third party who is active in the business as a factor in the passive appreciation in value during the marriage:
 

 Plaintiff urges that we apply
 
 McLeod
 
 and
 
 Phillips
 
 to the entire appreciation in value. She relies on her evidence that she and defendant ran the corporation, defendant's statements that Plato did not have a real share in business decisions, and defendant's dominance in handling business finances. She contends that this total control by the parties means the entire appreciation should have been designated marital property. Plato testified however that he had an equal share in running the business, and defendant's later statements agree with Plato.
 
 On this record the court could properly find that some part of the appreciation in value was due to the efforts of Plato Lawing
 
 . For the purposes of evaluating the contributions to the marital economy for equitable distribution, we see
 
 *493
 
 no difference between "passive" increases in separate property (interest, inflation) and "active" increases brought about by the labor of third parties for whom neither spouse has responsibility. The court therefore correctly rejected plaintiff's contention that she was entitled to marital treatment of the entire increase in value of the inherited stock.
 

 Nevertheless it would be contrary to the spirit of the Equitable Distribution Act and our decisions in
 
 McLeod
 
 and
 
 Phillips
 
 to hold that simply because a third party worked with plaintiff and defendant in a closely-held corporation, all increase in value automatically is exempted from treatment as marital property. Although the owner of separate shares was treated as the sole owner in
 
 Phillips
 
 , the presence of some minimal (2%) third party involvement did not preclude treatment of corporate appreciation during the marriage as marital property. Other states have generally recognized "active" appreciation of fractional interests in corporations as marital property, even though the underlying shareholder interest was separate property.
 

 Here the entire appreciation in value of the inherited shares was clearly identified for the trial court. The portion of the appreciation attributable to the active efforts of the parties was property "acquired" during the marriage. It therefore was presumably marital in nature.
 
 The only evidence regarding the appreciation was that sketchy evidence discussed above: that evidence did not rebut the presumption of marital property, but only plaintiff's claim to the entire appreciation.
 

 We therefore hold that the court erred in ruling that the entire appreciation in value of these separate shares was separate property.
 
 We remand for a determination of the proportion of the appreciation that may properly be classified as marital property. The court should make findings as to the value of the shares at the time of the inheritance and as of the date of valuation. It then should determine what proportion of that increase was due to funds, talent or labor that were contributed by the marital community, as opposed to passive increases due to interest and rising land value of land owned at inheritance, and the efforts of Plato.
 
 We recognize that
 
 *494
 
 we cannot require mathematical precision in making this determination. Nevertheless, the trial court must make a reasoned valuation, identifying to the extent possible the factors it considered.
 

 Id.
 

 at 175-76
 
 ,
 
 344 S.E.2d at 111-12
 
 (citations and headings omitted).
 

 Here, the trial court followed exactly the process directed by
 
 Lawing
 
 .
 
 See generally
 
 id.
 

 The trial court's findings show it made a "reasoned valuation" of the contribution of Husband's father to the appreciation in the Business.
 

 Id.
 

 at 176
 
 ,
 
 344 S.E.2d at 112
 
 . The law "cannot require mathematical precision
 
 *426
 
 in making" the allocation of passive and active appreciation during the marriage, but it is sufficient for the trial court to "make a reasoned valuation, identifying to the extent possible the factors it considered."
 

 Id.
 

 Specifically, the trial court noted that Joe started the business, which was operated on Joe's land. Joe had a "reputation in the community of being able to 'fix' or 'make' anything relating to machines, machinery, automobiles, engines, and/or motors." In addition, the trial court found
 

 Defendant's father worked in the business along with Defendant. He contributed machinery and equipment to the business. The business operated on property owned by Defendant's parents without having to pay any rent. Defendant's father made some of the equipment used in the business. Furthermore, he used his expertise as a mechanic to repair and maintain the equipment and machinery used in the business, saving the business from having to pay a third party for such repairs and maintenance and/or purchase new machinery and equipment.
 

 The trial court did not err in concluding that "[t]he active efforts of a third party, Defendant's father, contributed to the increase in the value of Defendant's interest in Blair Iron and Metal during the marriage."
 

 Wife also argues the trial court erred in considering changes in market conditions as a cause of the passive appreciation. Wife claims that although market conditions can be a proper consideration, "defendant merely offered that the rate of compensation for certain scrap materials had changed. The impact of these changes on the value of the business was never explained." (Citation omitted). Wife then notes that other factors could also contribute to appreciation, such as Husband's decision to switch the focus of the Business to scrap metal and the types of scrap metal he obtained.
 

 *495
 
 We have reviewed the trial testimony regarding the Business, the change to a scrap metal business from auto repair, changes in the prices and markets for scrap metal, and the expert valuation of the Business, and Husband offered sufficient evidence for the trial court to consider market conditions. Again, the law does not "require mathematical precision" in determining exactly how much the changes in market conditions contributed to the increase in value of the Business.
 

 Id.
 

 The trial court was well within its discretion to consider the evidence of changes in market conditions as contributing to the passive appreciation in the business during the marriage.
 

 E. Post-Separation Distributions to Husband
 

 Wife's remaining issues challenge the trial court's findings of fact and conclusions of law regarding post-separation distributions from the Business to Husband.
 
 [9]
 
 In finding 77, the trial court found distributions from the Business to each partner for these years:
 
*427 Year: Husband's distributions: Joe's distributions 2009 82,100 2010 87,950 2011 111,226 174,220 2012 65,300 31,700 2013 39,900 81,000

 Wife challenges these findings:
 

 76. As of the date of separation, Joe Blair was 72 years of age and in declining health. He can no longer handle the physical labor portion of the business. He has had bypass surgery and spinal degeneration, among other health problems. Many times he uses a wheelchair. He still works and does as much as he can to help with his former job duties. As a result, the equipment necessary to the company's operations declined. Competition in the scrap metal business increased, with some of Blair Iron and Metal's competitors being bought by conglomerates. Blair Iron and Metal could no longer compete on
 
 *496
 
 price to purchase scrap metal from the public, and came to rely solely on its industrial and commercial customers as sources of scrap metal. It lost some of those customers as well. Blair Iron and Metal's location on a rural road, as opposed to its main competitors being located on U.S. Highway 321, a major highway, also contributed to its inability to compete in purchasing scrap metal from the public. In addition, after the date of separation the market price of scrap metal declined from $16.00 and $17.00 per CW to $13.50 per CW.
 

 ....
 

 78. The post separation withdrawals were compensation for Defendant's active management efforts of Blair Iron and Metal and other daily management services and are the Defendant's separate property, not divisible property.
 

 Wife argues that "[a]t best, the funds distributed after the date of separation would only partially represent salary for [Husband]; a portion would be a return on investment." Because one-half of Husband's share of the Business is martial property, the same percentage of distributions after the date of separation representing the partnership's return on investment would be divisible property.
 
 See
 

 N.C. Gen. Stat. § 50-20
 
 (b)(4)(c) (2015) (defining divisible property as "[p]assive income from marital property received after the date of separation, including, but not limited to, interest and dividends.").
 

 Wife notes that Ms. Fonvielle presented evidence regarding the nature of the post-separation distributions to Husband:
 

 Q. All right. Well, let's go through it then. How would you characterize it, Ms. Fonville, as far as their distributions--.... compared to the revenue of the company?
 

 ....
 

 A. Um, well, the-he distributions are substantial, uh, but, you know, the business is making money. It's more than, uh, a salary that they would be paid for the work they did, but then they've invested in the company, so some of it's, um paying them for their efforts and some of it[']s return on their investment in the company.
 

 ....
 

 *428
 

 *497
 
 THE COURT: Could you repeat that? You said some of the-you-when looking at the distributions on page 15, that some of the distribution portion, you're saying you're-they-you're looking at that significant, yes, but they were paying it some as salary, some as a-as a return on their investment? Is that how you characterized the distributions? Is that what you were --
 

 THE WITNESS: I-I-well, as a partnership, they're not allowed to pay themselves a wage, so.
 

 THE COURT: Correct.
 

 THE WITNESS: So nothing shows up on the return, but obviously --
 

 THE COURT: Correct.
 

 THE WITNESS: -- they would want to receive compensation.
 

 THE COURT: Okay.
 

 THE WITNESS: So the total distribution, some of that would account for, um --
 

 THE COURT: A so-called salary.
 

 THE WITNESS: -- a so-called salary.
 

 THE COURT: Okay.
 

 THE WITNESS: And then the rest would be return on investment.
 

 Husband's
 
 only
 
 response to Wife's argument regarding post-separation distributions is that she waived this issue by not raising it before the trial court because it was not listed in the pretrial order. Husband argues "[t]he only issue of post-separation partnership income that she claimed as divisible property was rental income from the parties' rental property. (R p 106)[.]" Husband contends that Wife cannot raise this issue on appeal because she "stipulated in the pre-trial order that there were no issues to be determined by the Court other than those listed, thereby effectively stipulating that there was no issue for the trial court to determine with regard to post-separation distributions."
 

 We first note that the pre-trial order makes little mention of the Business or any related issues. And even if we assume for purposes of Husband's argument that Wife could have waived this issue by failing
 
 *498
 
 to list it in a pretrial order, Husband's reliance upon the pretrial order here is inexplicable. This trial started with no pretrial order and
 
 all
 
 of the substantive evidence regarding the Business was presented before the pretrial order was entered. The first three days of the trial were in 2014 and evidence regarding the Business was presented on these dates. On the third day of the trial, 9 December 2014, the trial court realized that there was no pretrial order in the file and admonished the parties for the lack of a pretrial order:
 

 THE COURT: And the other thing, I-I need to verify. There is no pretrial order in this file.
 

 MR. JENNINGS: That is correct --
 

 THE COURT: So --
 

 MR. JENNINGS: -- and I discussed that with you before we, um, before we started the --
 

 THE COURT: And I understand about the business, but there's not anything with any of the other assets, but there is no reason that there's not a pretrial order in this file.
 

 MR. JENNINGS: And --
 

 THE COURT: That needs to get done, because I'm not hearing anything on any blender pop pan car or any other item on any affidavit without a pretrial order.
 

 MR. JENNINGS: Okay.
 

 THE COURT: Okay?
 

 MR. JENNINGS: Yes, ma'am.
 

 THE COURT: I understand the business, because both of them listed it as unknown. I've got that. But I should still have a pretrial order with regards to all other assets and any other debts that they contend, and that needs to get done --
 

 MR. JENNINGS: We did --
 

 THE COURT: -- because it's been ordered to be done moons ago.
 

 MR. JENNINGS: Excuse me. I understand.
 

 *499
 
 THE COURT: I must have missed it, because otherwise I would probably already dismissed the case for non-compliance
 
 *429
 
 with the Court's orders, but I'm in it now and I hadn't done it. But,
 
 I want a pretrial order
 
 --
 

 MR. JENNINGS: Yes, ma'am.
 

 THE COURT:
 
 -- with every other item other than this business that's in contention.
 

 MR. JENNINGS: If I'm not mistaken, we did that before we started classification as far as put together a pretrial order --
 

 THE COURT: Okay.
 

 MR. JENNINGS: -- and had it available for Mr. Lackey. Um, he doesn't have it and Mr. Lackey and I, um, I don't know if you remember this, but I do because I know that I thought it was a real important point and I stuck it up there in the brain, uh, but, for whatever reason, I think we were ready, but you were saying that we were ready to go on this classification issue --
 

 THE COURT: Yes.
 

 MR. JENNINGS: -- (inaudible) let's get going (inaudible).
 

 THE COURT: Well, that was because that - I mean --
 

 MR. JENNINGS: And I understand.
 

 THE COURT: -- it needed to be done.
 

 MR. JENNINGS: I hear you and I'll have - what I'm saying is that work's been done on my part.
 

 THE COURT: Okay.
 

 MR. JENNINGS: And I'll get with Mr. Lackey and we'll shore up what we need to.
 

 (Emphasis added). The pretrial order was actually entered on 24 August 2015, prior to beginning the two days of the trial in 2015. During these two days, evidence regarding personal property was presented-not the substantive evidence about the Business or post-separation distributions
 
 *500
 
 from the Business. The pretrial order was in compliance with the trial court's instructions above: it addressed "every other item other than this business that's in contention." Husband cannot rely upon waiver where the pretrial order was entered
 
 after
 
 presentation of all of the evidence on the Business, including distributions from the Business to the partners, and where the trial court directed that the pretrial order was to address only the items in contention
 
 other
 
 than the Business.
 

 Thus turning back to Wife's argument, she contends the trial court erred by classifying all of the post-separation distributions as Husband's separate property because these payments are at least in part return on investment. Wife may be correct. In
 
 Montague v. Montague
 
 , the husband and wife formed a limited liability company to own and operate a commercial building.
 
 238 N.C. App. 61
 
 , 64,
 
 767 S.E.2d 71
 
 , 74 (2014). The trial court treated two post-separation distributions to the Husband as his separate property, characterizing them as "management fees" for his active management of the commercial building; this Court reversed and remanded:
 

 Wife contends that the trial court erred in treating two post-separation distributions made to Husband by the LLC as his separate property by characterizing these distributions as "management fees" he earned for managing the Montague Center after the parties separated. Specifically, the trial court treated as Husband's separate property a $5,010.00 distribution made to him in 2009 and a $26,200.00 distribution made to him in 2010. The key finding in the judgment with regard to these distributions states as follows:
 

 48. [Husband] actively manages the commercial property (negotiates all leases, collects rent payments, arranges for any "fit-up" required for a tenant, handles maintenance calls, does the landscaping, touch-up painting) and has done so since prior to the parties' separation. Plaintiff pays himself a management fee for this work in the form of a distribution.
 

 We agree with Wife that our holding in
 
 Hill v. Hill
 
 ,
 
 229 N.C. App. 511
 
 ,
 
 748 S.E.2d 352
 
 (2013), compels us to conclude that the trial court should have classified these distributions as divisible property rather than treating them as Husband's separate property. As divisible property,
 
 *501
 
 they must be distributed
 
 *430
 
 by the trial court. Accordingly, we reverse the trial court's classification of these distributions and remand the matter, directing the trial court to reclassify these distributions as divisible property and to make a distribution of this property.
 

 In
 
 Hill
 
 , the parties set up a Subchapter S corporation as a vehicle for the wife's speech pathology practice. The corporate tax returns showed that the wife took money from her practice in two ways: (1) in the form of a low salary; and (2) in the form of shareholder distributions. Evidence was presented that she took shareholder distributions for the purpose of avoiding federal taxes for Social Security and Medicare. The trial court re-characterized the post-separation shareholder distributions to the wife as salary that she earned and, therefore, classified them as her separate property. On appeal, however, our Court reversed, stating that the parties are bound by their established methods of operating the corporation. Our Court essentially determined that since the parties elected to treat a portion of the money paid to the wife as shareholder distributions, rather than treating it as salary expenses of the corporation, these funds were part of the retained earnings of the corporation. Our Court then held that since the retained earnings of a Subchapter S corporation, upon distribution to shareholders, are marital property, the wife was bound by the treatment of these shareholder distributions to her as divisible property.
 

 In the present case, the LLC is taxed as a partnership. The two distributions to Husband at issue here are treated on the LLC's 2009 and 2010 federal tax returns as withdrawals of partnership capital, and not as expenses of the partnership for property management services. Therefore, these distributions were part of the capital of the LLC and, therefore, belonged to the LLC. Had the distributions been treated as "management fees" on the federal tax returns, they would have been LLC expenses, which would have reduced the LLC's net income for 2009 and 2010 by $31,210.00, which potentially would have reduced Wife's personal tax liability.
 

 We note that Husband may have, in fact, earned these distributions as management fees; however, we are compelled by
 
 Hill
 
 to conclude that Husband, being the majority
 
 *502
 
 owner and a manager of the LLC, is "bound" by the manner in which these post-separation distributions to him were characterized on the LLC tax returns. Accordingly, we strike the trial court's finding that Husband was paid for his efforts in managing the LLC, reverse the portion of the judgment treating the post-separation distributions from the LLC to Husband as his separate property, and remand the matter to the trial court to classify them as divisible property and to distribute this property.
 

 Montague
 
 ,
 
 238 N.C. App. at 64-66
 
 ,
 
 767 S.E.2d at 74-75
 
 (citations, quotation marks, and brackets omitted).
 

 Here, this Business is a partnership, and is required to file Form 1065, the U.S. Return of Partnership Income. Form 1065 is filed annually with the Internal Revenue Service for informational purposes only, in that any profits or losses are "passed through" to the general partners for taxation. A Schedule K-1 for each partner is filed with the 1065 to report the partners' shares of any income, losses, deductions, credits, and other relevant information. The partners use the information provided on the Schedule K-1 to prepare their individual income tax returns.
 

 In the present case, the Business partnership returns for years 2009-2013, with accompanying Schedule K-1s, were introduced into evidence as Plaintiff's Exhibits 24-28. Partnership distributions to Husband and his father were characterized on the returns as follows:
 
*431 Self-Employment Earnings Capital Distributions K-1, Line 1 or 14(A) K-1, Line 19 Exhibit Year Husband Joe Husband Joe #24 2009 29,328.00 19,552.00 0 0 #25 2010 93,939.00 62,626.00 0 0 #26 2011 209,180.00 139,453.00 0 0 #27 2012 40,012.00 26,675.00 0 0 #28 2013 47,204.00 31,469.00 0 0

 In addition, the returns reflect that no withdrawals or distributions were made from either Husband's or Joe's capital accounts.
 

 The trial court found the Business made distributions to the Business partners that varied substantially from the figures reflected
 
 *503
 
 on the Business partnership returns for these years. These figures were taken from Exhibit #5, the Blair Iron and Metal Valuation as of December 31, 2013, prepared by Ms. Fonvielle.
 
 [10]
 
 It is unclear from the Valuation whether the distributions are income to Husband and Joe, return of capital, or of another nature. However, the trial court found that the distributions were income, and thus Husband's separate property.
 

 In accord with
 
 Hill
 
 and
 
 Montague
 
 , the parties are bound by the characterization of the distributions on the income tax returns.
 
 See
 

 Montague
 
 ,
 
 238 N.C. App. at 64-66
 
 ,
 
 767 S.E.2d at 74-75
 
 . While it is clear that a considerable portion of the post-separation distributions to Husband was self-employment income on which Husband was liable for income and self-employment taxes, the remaining distributions may or may not be a return of capital. Post-separation self-employment income would properly be classified as Husband's separate property, and a post-separation return of capital to Husband would be properly classified as divisible property which should be distributed by the court. Accordingly, we vacate the trial court's classification of the post-separation distributions to Husband as his separate property and remand for entry of an order classifying the distributions in accord with the nature of the distributions, with due regard for the classification of the distributions on the Business's partnership returns, and distributing them properly.
 

 IV. Conclusion
 

 We affirm the trial court's classification and valuation of the Husband's interest in a partnership with his father, but reverse the classification and distribution of the post-separation distributions from the partnership to Husband. We remand for entry of additional findings concerning the nature of the post-separation distributions to Husband and the proper classification, valuation, and, if appropriate, distribution of this property. In addition, the trial court may revise the overall distribution of the marital and divisible property as needed to equalize the distribution in response to any changes in classification and valuation.
 
 [11]
 

 *504
 
 On remand, the trial court may in its sole discretion hold a hearing and receive additional evidence as needed to address the issues on remand.
 

 *432
 
 AFFIRMED in part; REVERSED in part; REMANDED.
 

 Judges ZACHARY and ARROWOOD concur.
 

 [1]
 

 Wife's claim for alimony was dismissed and is not a subject of this appeal.
 

 [2]
 

 Husband listed seven proposed issues in the Record on Appeal. The three issues addressed in his petition for certiorari encompass most of the issues in the Record on Appeal, although not worded exactly the same. The remaining proposed issues generally relate to determination of the marital interest in the Business, and we have addressed these issues based upon Wife's appeal.
 

 [3]
 

 The trial court found that Wife was not a partner in the Business, and she does not contest that finding on appeal, although the transcript shows that it was a "theory" she advocated at trial.
 

 [4]
 

 Trial court skipped finding number 17.
 

 [5]
 

 Finding 33 is supported by the evidence, and Wife does not contend otherwise, but rather challenges the conclusion of law regarding the percentages of ownership.
 

 [6]
 

 The CPA's name is spelled in different ways throughout in our record. The transcript notes it as "Fonville" while the trial court spells it "Fonvielle." Ms. Fonvielle's own letterhead is spelled as the trial court spelled it. We will use the trial court's spelling in our opinion but some of our quotes will use the "Fonville" spelling because that is how her name was spelled in that document.
 

 [7]
 

 The consent order is not in our record, so the only information we have regarding the terms of Ms. Fonvielle's evaluation is from her report, some emails and letters, and her trial testimony.
 

 [8]
 

 Husband acquired his interest in the business on 1 January 1994, although he did not quit his other job and work with the business full-time until 11 February 1994. The parties were married on 28 February 1994.
 

 [9]
 

 These issues are separated into Issues I, II and VI in Wife's brief.
 

 [10]
 

 As mentioned above, we do not have the consent order setting out the scope of Ms. Fonvielle's evaluation; we are assuming based upon the testimony that the main purpose of Ms. Fonvielle's evaluation was to value the Business and not necessarily to assist the trial court in the classification of the post-separation distributions to the partners.
 

 [11]
 

 The distribution of marital and divisible property on remand shall remain equal, since the trial court found in the order on appeal that "[n]either party contended in the pre-trial order that other than an equal division of marital and divisible property is equitable, nor did either party produce evidence at trial to overcome the presumption that an equal division of marital and divisible property is equitable" and concluded that an equal distribution of marital and divisible property is equitable. Appellant has challenged this finding or conclusion on appeal.